# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MURPHY MEDICAL ASSOCIATES, LLC; DIAGNOSTIC AND MEDICAL SPECIALISTS OF GREENWICH, LLC; and STEVEN A.R. MURPHY, M.D., <br><br> Plaintiffs, <br><br> v. <br><br> EMBLEMHEALTH, INC.; GROUP HEALTH INCORPORATED and CONNECTICARE, INC., <br><br> Defendants. | Civil Action No. <br> 3:22 - CV - 59 (CSH) <br><br><br> **OCTOBER 3, 2024** |

## RULING ON DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT
### [Doc. 16]

**HAIGHT, Senior District Judge:**

## I.  INTRODUCTION

Plaintiffs— medical providers Murphy Medical Associates, LLC; Diagnostic and Medical Specialists of Greenwich, LLC; and Steven A.R. Murphy, M.D. (herein collectively "Plaintiffs" or the "Murphy Practice")—commenced this case against Defendant insurance providers— EmblemHealth, Inc.; Group Health, Inc.; and ConnectiCare, Inc. (herein "Defendants")— alleging failure to comply with "federal and state law, as well as principles of equity, by refusing to reimburse Plaintiffs for COVID-19 testing that Plaintiffs provided to members and/or beneficiaries of Defendants' health plans in the midst of a public health crisis." Doc. 1 ("Complaint"), ¶ 1.

In 2020, in response to the COVID-19 pandemic and public health emergency, Congress

passed two statutes, the Families First Coronavirus Response Act ("FFCRA") and the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), mandating that all fully-insured, level-funded, and self-insured health plans cover COVID-19 testing and related services provided by in-network or out-of-network providers. According to Plaintiffs, Defendants have refused to honor these statutes and have "instead, . . . either attempted to infinitesimally 'reimburse' [Plaintiffs] or [have] issued outright denials of claims submitted by [them]." *Id.* ¶ 4.

As the result of Defendants' alleged failure to reimburse the Murphy Practice, Plaintiffs bring the following eight counts of claims: (1) violation of § 6001 of the FFCRA, Pub. L. 116-127, and § 3202(a) of the CARES Act, Pub. L. 116-136; (2) violation of § 2719A of the Affordable Care Act ("ACA"), 42 U.S.C. § 300gg-19a and 29 U.S.C. § 1185d(a); (3) an ERISA benefits claim, 29 U.S.C. § 1132(a)(1)(B); (4) ERISA equitable relief, 29 U.S.C. § 1132(a)(3) and 29 U.S.C. § 1133; (5) unjust enrichment; (6) breach of implied contract and/or third-party beneficiary; (7) violation of the Connecticut Unfair Insurance Practices Act ("CUIPA"), Conn. Gen. Stat. § 38a-816; and (8) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b *et seq.*[1]

Pending before the Court is Defendants' "Motion to Dismiss" the Complaint [Doc. 16] "in its entirety, and with prejudice," because the Complaint "fails to allege the factual and legal bas[e]s necessary for viable claims against Defendants." Doc. 16-1 (Defendants' Memo in Support), at 13. The Court resolves this motion herein.

---

[1] The Court notes that in the Complaint, Plaintiffs included two "Sixth" causes of action, one for "breach of contract" and the other for "violations of CUIPA." Doc. 1, at 24, 26. Consequently, the Court refers to the CUIPA-based cause of action as the seventh cause of action and the CUTPA claim as the eighth cause of action.

## II.  BACKGROUND

During the COVID-19 pandemic, which fully emerged in March 2020, Congress acted to address the public health crisis by enacting two statutes to ensure that individuals who needed a test for the disease could obtain one, regardless of their insurance status or financial ability. On March 18, 2020, in response to the outbreak of the COVID-19 pandemic in the United States, Congress enacted the Families First Coronavirus Response Act ("FFCRA"), Pub. L. 116-127, 134 Stat. 178. Section 6001 of the FFCRA, captioned "Coverage of Testing for COVID-19," requires health insurers to cover, at no additional expense to insureds, diagnostic products for detection of COVID-19. Pub. L. 116-127, § 6001(a).  In addition, the FFCRA contains an enforcement provision, mandating that the statute "shall be applied by the Secretary of Health and Human Services, Secretary of Labor, and Secretary of the Treasury" to insurers ("group health plans and health insurance issuers")  "as if included in" certain provisions of the Public Health Service Act, the Employee Retirement Income Security Act of 1974, and the Internal Revenue Code of 1986. *Id.* § 6001(b).

Shortly thereafter, on March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES" Act), Pub. L. 116-136, 134 Stat. 281. Section 3202 of the CARES Act, entitled "Pricing of Diagnostic Testing," states that insurers providing coverage of COVID-19 diagnostic products, as "described in section 6001(a)" of the FFCRA, "shall reimburse the provider of the diagnostic testing" at either "a negotiated rate" or "in an amount that equals the cash price for such service as listed by the provider on a public internet website." Pub. L. 116-136, § 3202(a).  Under § 3202(b) of the CARES Act, "each provider of a diagnostic test for COVID-19" must publish its cash price for the COVID-19 test "on a public internet website." *Id.* § 3202(b)(1).

3

With respect to enforcement, the "Secretary of Health and Human Services may impose a civil monetary penalty on any provider of a diagnostic test for COVID-19" that fails to comply with the mandate to post the cash price on its public internet website. *Id.* § 3202(b)(2).

In the case at bar, Dr. Steven Murphy, a self-proclaimed "board-certified internist," formed the Murphy Practice "over a decade ago" with the aim to provide "preventive and general health services, as well as acute primary care, to men, women, and adolescents." Doc. 1, ¶ 29. "Among its other services, the Murphy Practice operates a state-licensed physician office laboratory located at 30 Buxton Farms Road in Stamford, Connecticut." *Id.* ¶ 30. Dr. Murphy represents that he is the certified laboratory director for this laboratory under the federal Clinical Laboratory Improvement Amendments ("CLIA") and Connecticut law. *Id.* On or about March 9, 2020, in response to the COVID-19 pandemic, "the Murphy Practice, an internal medicine practice with offices throughout Connecticut, invested hundreds of thousands of dollars to transform its traditional medical practice to set up COVID-19 testing sites throughout Connecticut and New York." *Id.* ¶ 31.

The Murphy Practice established numerous testing centers for residents of New York and southern Connecticut and ultimately provided COVID-19 testing and/or related services to over 35,000 patients, engaging in over 85,000 unique encounters with those patients.[2] *Id.* ¶ 35; *see also* Doc. 20-1 (Decl. of Steven A.R. Murphy, M.D.), ¶¶ 12-15. At their sites, Plaintiffs "utilized nasopharyngeal swabs to collect patient samples" to test individuals "with symptoms or suspected exposure to the novel coronavirus." Doc. 1, ¶¶ 32, 36. Plaintiffs allege that they had the option of

---

[2]   According to the Complaint, "the Murphy Practice operated drive [up] and/or walk-through COVID-19 testing sites in, among other places, Greenwich, Stamford, New Canaan, Darien, Fairfield, Bridgeport, New Haven, West Haven, Stratford, and Ridgefield, Connecticut, and Bedford, Brooklyn, and Pound Ridge, New York." Doc. 1, ¶ 34.

sending these test swabs for analysis to either an outside "third-party laboratory" or "to the Murphy Practice's lab" in Stamford. *Id.* ¶¶ 36, 38. The Murphy lab was "able to process internally many of the patient samples" collected, *id.* ¶ 37; and, "upon [Plaintiffs'] information and belief, all swabs of Defendants' members and/or beneficiaries were processed in the Murphy Practice's laboratory," *id.* ¶ 55. The "vast majority of swabs that the Murphy Practice processed internally in its laboratory" were run through a "BioFire machine," which tested for coronavirus, but also included a multiplex respiratory panel that tested for twenty-one (21) other respiratory pathogens. *Id.* ¶¶ 39-41. As a result of such testing Murphy collected $1,500 or more for each single "swab."[3]

As described in the Complaint, Defendants are insurers. Emblem is "one of the largest nonprofit health plan issuers in the United States" and Group Health, Inc. ("GHI"), and ConnectiCare, Inc. ("ConnectiCare") are Emblem's "wholly owned managed care health insurance subsidiaries." Doc. 1, ¶ 1. Plaintiffs allege that Defendants have "blatantly def[ied] federal and state law, as well as principles of equity, by refusing to reimburse Plaintiffs for COVID-19 testing that Plaintiffs provided to members and/or beneficiaries of Defendants' health plans in the midst of a public health crisis." *Id.*

In response, Defendants assert that "Plaintiffs fall into that group of providers the federal government has identified as 'using the public health emergency as an opportunity to impose extraordinarily high charges.'" Doc. 16-1, at 13 (quoting "FAQs About [FFCRA] and [CARES] Act Implementation Part 44" (February 26, 2021), Q6,

---

[3] The Court takes judicial notice that according to the Murphy Practice's public website, "CoronaTestCT," https://coronatestct.com, prospective test subjects were informed that Murphy "may bill your insurance company between approximately $200 and $600 for COVID-only tests sent to an outside lab, but "will bill your insurance $1,500" for running the panel for 21 respiratory pathogens with the BioFire test.

https://www.cms.gov/files/document/faqs-part-44.pdf, at 4).    In support of this allegation, Defendants provide a list of news articles in which "Murphy's business model has generated significant public outcry and negative publicity." Doc. 16-1, at 14.[4]  In addition, as discussed below, Defendants cite a "raft of lawsuits" in which other health plans have "challenged Murphy's abusive billing."  *Id.* at 14-15 (collecting cases).

### III.  SUMMARY OF CLAIMS AND GROUNDS FOR DISMISSAL

In the Complaint, Plaintiffs allege that the Murphy Practice set up drive- up and/or walk-through COVID testing operations in southwest Connecticut and New York.  Doc. 1, ¶ 34. These sites implemented COVID-19 testing for individuals who had "symptoms or suspected exposure to the novel coronavirus." *Id.* ¶ 32.  Despite the alternative to send test swabs to an outside commercial laboratory, Plaintiffs processed all swabs of Defendants' members and/or beneficiaries in Murphy's laboratories. *Id.* ¶ 55.  These swabs were run through a "BioFire machine," testing for 21 other respiratory pathogens with a multiplex respiratory panel.  *Id.* ¶¶ 39-41. The Murphy Practice then collected $1,500 or more per single swab.  *See* Doc. 1-2, Emblem Spreadsheet with "Billed Charge," at 2-12.

The Murphy Practice justifies its use of the multiplex test by stating that "information about other potential respiratory viruses or infections is vitally important to ensure that patients who present with symptoms or were possibly exposed to COVID-19 receive the most appropriate and effective course of treatment." Doc. 16-1, at 17-18 (citing Doc. 1, ¶ 42).  However, rather than

---

[4]  *See, e.g.*, Sarah Kliff, *These Towns Trusted a Doctor to Set Up Covid Testing.  Sample Patient Fee:  $1,944*, N.Y. TIMES, Nov. 10, 2020 (updated Nov. 24, 2021), https://www.nytimes.com/2020/11/10/upshot/covid-testing-doctor-fees.html; Thomas Breen, *"Profiteer" Set Up in City Amid Fraud Probe*, NEW HAVEN INDEPENDENT, June 18, 2021, https://www.newhavenindependent.org/article/1_patient_22_covid_tests_46764_billed.

alleging that the federal coronavirus statutes require health plans to cover the cost of testing for non-COVID-19 respiratory pathogens in conjunction with COVID-19 tests, Plaintiffs assert that "the CDC strongly encourages clinicians to test for other causes of respiratory illness."  Doc. 1, ¶ 44 (citing "FAQs About [FFCRA] and [CARES] Act Implementation Part 42" (April 11, 2020), Q5, https://www.cms.gov/files/document/FFCRA-Part-42-FAQs.pdf).[5]    The Murphy Practice thus alleges that it was "entitled to assume the diagnostic impetus behind each test."  Doc. 1,  ¶ 54.

In addition to charging health care plans for multiplex testing in lieu of COVID testing, the Murphy Practice seeks recovery for "a thorough medical history and basic examination . . . to ensure that the patient receives the most appropriate and effective treatment," "preventative medicine counseling regarding the taking of universal precautions" and,  perhaps more vaguely,  "other vitally necessary actions or things to avoid." *Id.* ¶ 46.  Additionally, Plaintiffs allege that "clinical personnel conducted telemedicine visits" between the day samples were taken and when the results became available with those individuals who had visited a site—even if said individuals were asymptomatic—to "check on  their  conditions and determine whether further medical intervention was needed." *Id.* ¶ 47.  Plaintiffs presented no facts to demonstrate what "check on their conditions" entailed or the reason it was medically necessary for such checks.

In the Complaint, Plaintiffs allege that a health plan is "obligated to pay the provider its cash

---

[5]  The cited FAQs do not state that every person seeking a COVID-19 test (including those who are asymptomatic) should be given a multiplex test for other respiratory pathogens.   Instead, the FAQs refer to testing with respect to "symptomatic" individuals as follows:

The Centers for Disease Control and Prevention (CDC) advises that clinicians should use their judgment to determine if a patient *has signs and symptoms compatible with COVID-19* and  whether the patient should be tested.

*See* https://www.cms.gov/files/document/FFCRA-Part-42-FAQs.pdf , at 6 (emphasis added).

price" for providing COVID-19 testing and/or related services if there is no negotiated rate between the provider and the plan. *Id.* ¶ 81. The Complaint, however, includes no specific "cash price" for any services for which the Murphy Practice seeks payment. Rather, it simply alleges that "despite numerous and persistent demands and requests" by Plaintiffs, Defendants "have each failed and refused to [pay] anything remotely close to the Murphy Practice's cash price for providing the COVID-19 testing and related services." *Id.* ¶ 82.

Based on these claims, Plaintiffs seek damages totaling approximately $4.4 million from Defendants. *Id.* ¶¶ 83-85. This amount includes $634,494.47 from Emblem, $3,641,049.00 from ConnectiCare, and $128,133.00 from Group Health, plus interest, costs and disbursements, and attorneys' fees from each Defendant. *Id.*

Defendants now move for dismissal of each count pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that the "Complaint fails to state any viable claim upon which relief can be granted." Doc. 16, at 1. Defendants make the following arguments in support of that motion.

First, as to violation of the FFCRA and/or the CARES Act, Defendants state that the Murphy Practice has "no private right of action" under either statute. Doc. 16-1, at 15 (citing *Murphy Med. Assocs., LLC v. Cigna Health and Life Ins. Co.*, No. 3:20-cv-01675 (JBA), 2022 WL 743088, at *6 (D. Conn. Mar. 11, 2022)). Moreover, the federal Coronavirus statutes do not mandate coverage of tests for non-COVID respiratory pathogens or post-test services, such as "nutrition counseling." Doc. 16-1, at 16. In any event, the Murphy Practice failed to post a legitimate "cash price" for testing. *Id.*

As to the Second Cause of Action, the Murphy Practice has no private right of action under

§ 2719A of the ACA. *Id.*  Even if such an action existed, § 2719A applies only to "emergency services," which are "distinct from Murphy's services at issue in this case." *Id.*

Third, Plaintiffs have failed to "plausibly allege standing to assert an ERISA benefits claim, much less an ERISA equitable claim." *Id.*  It is well-established that a medical provider has ERISA standing only upon "obtaining a valid assignment of benefits from a patient in exchange for health care services;" and the Murphy Practice has simply alleged that "some" individuals tested provided assignments, without specifying who gave an assignment and/or what was actually stated in any such assignment. *Id.*

Additionally, even if Plaintiffs had standing, the ERISA claims are "substantively deficient." *Id.*  Plaintiffs have failed to name any particular "plan provision that requires the payment of the benefits sought in this lawsuit." *Id.*  Plaintiffs have also failed to plead sufficient facts to establish that they have exhausted their administrative remedies.  *Id.*  Instead of asserting valid benefits claims, the Murphy Practice has brought "an equitable claim to circumvent the requirements of a benefits claim"—one that is precluded by case precedent.  *Id.*

Fourth, Plaintiffs' alternative state law claims are preempted by ERISA because they seek ERISA benefits.  *Id.*  The "Complaint fails to identify a single non-ERISA plan otherwise subject to state law." *Id.*  Moreover, even "if that flaw [were] cured, none of the state law claims allege facts sufficient to satisfy essential elements of such claims." *Id.* at 16-17.  For example, Plaintiffs' CUIPA claim fails because CUIPA provides no private right of action.  *Id.* at 17.  Furthermore, the CUTPA claim, which seeks CUIPA enforcement, "fails for multiple reasons, including [the fact] that simple payment disputes are not actionable under that statute." *Id.*

### IV.  LEGAL STANDARD - Dismissal under Fed. R. Civ. P. 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of the complaint if that pleading fails "to state a claim upon which relief may be granted." Under the United States Supreme Court's seminal holding in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), to survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" 556 U.S. at 678   (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S 544, 570 (2007)). *See also Vengalattore v. Cornell Univ.*, 36 F.4th 87, 102 (2d Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678  (quoting *Twombly*, 550 U.S. at 570). In so pleading, the plaintiff must provide "more than the unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555).

In ruling on a 12(b)(6) motion, the court must accept the factual allegations in the complaint as true and draw all reasonable inferences in the light most favorable to the non-moving party. *Trustees of Upstate New York Engineers Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016) (citation omitted), *cert. denied*, 582 U.S. 917 (2017). "[W]hether a complaint states a plausible claim for relief will [ ultimately] . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. When "well-pleaded factual allegations" are present, "a court should assume their veracity and then

determine whether they plausibly give rise to an entitlement to relief." *Id.* Factual disputes do not factor into a plausibility analysis under *Iqbal* and its progeny.

"Although a court must accept as true all the factual allegations in the complaint, that requirement is 'inapplicable to legal conclusions.' " *Vaughn v. Phoenix House New York Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). The deference given to factual allegations simply "does not extend . . . to pleaded legal conclusions." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Iqbal*, 556 U.S. at 678).  The court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted))."Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

In deciding a motion to dismiss under Rule 12(b)(6), "the court' s task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). "The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct." *Lynch*, 952 F.3d at 75 (citing and quoting *Twombly*, 550 U.S. at 556).

# V.  DISCUSSION

## A.  Count One: "FFCRA and CARES Act"

### 1.  No Private Right of Action

In the case at bar, Plaintiffs assert that Defendants insurers have violated the FFCRA and the CARES Act (also collectively herein, "Coronavirus Legislation") by "fail[ing] and refus[ing] to provide . . . the Murphy Practice's cash price for providing the COVID-19 testing and related services." Doc. 1, ¶ 82.  In response, Defendants argue that there is no private right of action under the Coronavirus Legislation and, accordingly, Plaintiffs' first cause of action must be dismissed. Doc. 16-1, at 8-16.

Although the Second Circuit has not addressed the issue, as Judge Bryant of this District stated in *Murphy Medical Associates., LLC v. Centene Corp.*, No. 3:22-CV-504-VLB, 2023 WL 2384143 (D. Conn. Mar. 6, 2023):

> Virtually every district court that addressed whether the FFCRA and CARES Act provide[ ] a private right of action in cases such as this—where a health care provider sues an insurer for violating these provisions by failing to pay claims for COVID-19 testing and related services—have all concluded that the Acts do not provide a private right of action.

2023 WL 2384143, at *6 (collecting cases in n.6).[6]   That is because, as explained by the Ninth Circuit, "[l]ike substantive federal law itself, private rights of action to enforce federal law must be

---

[6]    *See also Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*, No. 3:20CV1675(JBA), 2022 WL 743088, at *6 (D. Conn. Mar. 11, 2022) ("Mindful that the Supreme Court 'has increasingly discouraged the recognition of implied rights of actions without a clear indication of congressional intent,' *Duplan v. City of N.Y.*, 888 F.3d 612, 621 (2d Cir. 2018), the Court concludes that neither § 6001 of the FFCRA nor § 3202 of the CARES Act contains a private right of action."), *on reconsideration*, No. 3:20CV1675(JBA), 2022 WL 10560321 (D. Conn. Oct. 18, 2022).

created by Congress." *Saloojas, Inc. v. Aetna Health of California, Inc.*, 80 F.4th 1011, 1014 (9th

Cir. 2023) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)).  The courts must "interpret

the statute Congress has passed to determine whether it displays an intent to create not just a private

right but also a private remedy" and then "[s]tatutory intent on this latter point is determinative."

*Saloojas*, 80 F.4th at 1014 (citing *Sandoval*, 532 U.S. at 286).

Here, the Coronavirus Legislation "does not contain rights-creating language that would

evince Congress's intent to create a private right of action for providers to sue insurers." 80 F. 4th at

1015 (discussing § 3202(a)(2) of the CARES Act).  The FFRCA and the CARES Act lay out their

own enforcement mechanisms.

Section 6001 of the FFCRA includes enforcement and implementation provisions for the

Secretaries of various agencies—Health and Human Services, Labor, and the Treasury.  FFCRA,

Pub. L. 116-127, March 18, 2020, 134 Stat. 178, § 6001(b), (c). Section 6001(b) provides

congressional direction for regulatory enforcement, stating that "[t]he provisions of subsection (a)

shall be applied by the Secretary of Health and Human Services, Secretary of Labor, and Secretary

of the Treasury to group health plans and health insurance issuers offering group or individual health

insurance coverage[.]" *Id.* § 6001(b).  Moreover, Section 6001(c) provides that those three agencies

"may implement the provisions of this section through sub-regulatory guidance, program instruction,

or otherwise." *Id.* § 6001(c).  "[T]he fact that these provisions [of the FFCRA] provide an

enforcement mechanism but only through the Secretaries suggests a lack of congressional intent to

create a private right of action for providers." *Saloojas*, 80 F.4th at 1016 (citing *Sandoval*, 532 U.S.

at 289).

Furthermore, "passed soon after [the] FFCRA," the CARES Act "expands on the

requirements in § 6001(a) of [the] FFCRA." *Id.* As the Ninth Circuit noted in *Saloojas*, "Section 3202(b) of the CARES Act authorizes the Secretary of Health and Human Services to impose a monetary penalty on any provider that fails to publicly post its cash price." 80 F.4th at 1016. In particular, Section 3202(b)(1) of the CARES Act requires providers to "make public the cash price for such test on a public internet website of such provider[,]" and authorizes the Secretary of Health and Human Services to "impose a civil monetary penalty on any provider . . . that is not in compliance with" that requirement. Pub. L. 116-136, March 27, 2020, § 3202(b)(1)-(2).[7] The fact "[t]hat Congress chose to include an enforcement mechanism in the CARES Act that is limited to actions by the Secretary against a provider of testing services cuts strongly against a finding of intent to create a private remedy for those providers." *Saloojas,* 80 F.4th at 1016 (citing *Sandoval*, 532 U.S. at 289).

"[P]rivate rights of action to enforce federal law must be created by Congress." *Sandoval*, 532 U.S. at 286 (citing *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979)). A private right of action is created either expressly "or, more rarely, by implication." *Rep. of Iraq v. ABB AG*, 768 F.3d 145, 170 (2d Cir. 2014). "[I]mplied rights of action are disfavored, and will not be found in the absence of clear evidence of legislative intent." *Moya v. United States Dep't of Homeland Security*, 975 F.3d 120, 128 (2d Cir. 2020) (citations omitted). *See also Rep. of Iraq*, 768 F.3d at 170 (noting that the court was "mindful that 'the Supreme Court has come to view the implication of private remedies in regulatory statutes with increasing disfavor.'") (quoting *Hallwood Realty Partners, L.P.*

---

[7] "Cash price" is "the charge that applies to an individual who pays cash (or cash equivalent) for a COVID-19 diagnostic test." 45 C.F.R. § 182.20. Regulatory agencies described their expectation that "the 'cash price' established by the provider will be generally similar to, or lower than, rates negotiated with in-network plans and insurers." 85 Fed. Reg. 71152.

*v. Gotham Partners, L.P.*, 286 F.3d 613, 618 (2d Cir. 2002)).

Here, neither the FFCRA nor the CARES Act creates an express private right of action for providers to sue health plans to obtain COVID-19 test payments.  Section 6001 of the FFCRA expressly authorizes three federal agencies to enforce its provisions.  Similarly, Section 3202 of the CARES Act authorizes the Secretary of Health and Human Services to impose a penalty on any provider who fails to post a cash price for COVID-19 testing.

### 2. *Supplemental Authorities*

Following the originally delineated briefing period, Defendants filed a series of supplemental authorities pertaining to the issue of whether the FFCRA and the CARES Act create an implied private right of action for providers, such as Plaintiffs, to seek payment on health plans from insurers for COVID testing services. *See* Doc. 26-31 (Third to Seventh Notices of Supplemental Authority in Support of Defendants' Motion to Dismiss).  In each such "Notice"  Defendants proffered decisions in which federal courts held that the FFCRA and the CARES Act do not create such a private right of action for providers of testing services.  Most of the rulings were entered by courts outside of the Second Circuit; and of those within the Second Circuit, the decisions were written by district judges, as opposed to the Court of Appeals, so are non-binding.[8]  Nonetheless, the decisions,

---

[8] Judges in the Northern District of California issued three of these decisions.  *See Saloojas, Inc. v. Aetna Health of California, Inc.*, No. 22-CV-02887-JSC, 2022 WL 4775877, at *2 (N.D. Cal. Sept. 30, 2022) ("Plaintiff's first claim fails as a matter of law. There is no private right of action to enforce Section 3202(a)(2) of the CARES Act or Section 6001 of the FFCRA by requiring Defendant to pay Plaintiff's posted cash price."); *Saloojas Inc. v. Blue Shield of California Life & Health Ins. Co.*, No. 22-CV-03267-MMC, 2022 WL 4843071, at *1 (N.D. Cal. Oct. 3, 2022) (dismissing claim for violation of the FFCRA and the CARES Act "for the reason that, as the overwhelming majority of district courts to have addressed the issue have found, neither § 6001 of the FFCRA, nor § 3202 of the CARES Act creates a private right of action") (internal citations omitted); *Saloojas, Inc. v. Cigna Healthcare of California, Inc.*, No. 22-CV-03270-CRB, 2022 WL 5265141, at *4 (N.D. Cal. Oct. 6, 2022) ("The text and structure of the CARES Act and the FFCRA do not indicate that

in total, were persuasive to this Court on this issue, lending further support for my finding that these federal statutes do not create a private right of action for the Murphy Practice against the Defendant insurers in this case.

Most notably Judge Dooley of this District summarized in *Murphy Medical Associates, LLC v. Yale University,* No. 3:22-CV-33 (KAD), 2023 WL 2631798 (D. Conn. Mar. 24, 2023), that "[a]s examined by numerous courts, the language of § 6001 of the FFCRA and § 3202 of the CARES Act . . . reveal[s] no intent on the part of Congress to afford health care providers a privately enforceable remedy for the failure to pay claims for COVID-19 testing and related services." 2023 WL 2631798, at *3 (collecting cases).   In circumstances factually similar to those in the present case, plaintiff Murphy Medical had alleged that defendant Yale violated the FFCRA and CARES Act by failing to reimburse Murphy Medical for COVID-19 testing and related services it performed for Yale members and beneficiaries because a "health plan is obligated to pay the provider its cash price for providing those services if the parties have not otherwise negotiated a rate." *Id.* at *2 (internal quotation marks omitted).   Yale moved for dismissal of the claim "insofar as the FFCRA and CARES Act do not provide a private cause of action for healthcare providers." *Id.*  Murphy Medical responded by arguing that the Court should find an implied private cause of action in the denoted legislation.

---

Congress intended to create a private cause of action for providers like Saloojas.")

Judge Dooley held that no such private cause of action exists and granted Yale's motion to dismiss claims under both statutes.  As Judge Dooley noted, and as this Court discussed *supra*:

> A number of district courts, including two in this district, have examined this issue and rejected the invitation to read a private cause of action into the FFCRA and CARES Act. The Court agrees with these courts, and particularly, the well-reasoned decisions of Judge Arterton and Judge Bryant (which involve substantially the same plaintiffs as those in this case).[9]

2023 WL 2631798, at *2.  In addressing the same Murphy Plaintiffs, with a similar fact pattern and substantively duplicate arguments, this Court finds that no implied private action under the FFCRA and/or the CARES Act is available to the Murphy Practice.

In the absence of a statutory intent by Congress to create a cause of action, such an action does not exist.  "[C]ourts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Saloojas,* 80 F.4th at 1016 (quoting *Sandoval*, 532 U.S. at 286–87).  Plaintiffs' first cause of action under the FFCRA and the CARES Act will be dismissed with prejudice.

It is the practice in this District to direct that the dismissal of an action such as this one, on the ground that no private right of action exists under the relevant federal statutes, is with prejudice. *See, e.g., Murphy Med. Assocs., LLC v. Yale Univ.*, No. 3:22-CV-33 (KAD), 2023 WL 2631798, at *3 (D. Conn. Mar. 24, 2023) ("[T]he FFCRA/CARES Act does not carry with it an implied private cause of action to enforce its terms. .. .  The motion to dismiss as to Count One is GRANTED and the claim is dismissed *with prejudice.*") (emphasis in original) (citation and internal quotation marks omitted).

---

[9]  *See Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*, No. 3:20CV1675 (JBA), 2022 WL 743088 (D. Conn. Mar. 11, 2022); *Murphy Med. Assocs., LLC v. Centene Corp.*, No. 3:22-CV-504-VLB, 2023 WL 2384143 (D. Conn. Mar. 6, 2023).

**B. Count Two: Section 2719A of the ACA**

In the Second Count of the Complaint, Plaintiffs allege that Defendants have violated § 2719A of the Patient Protection and Affordable Cares Act ("ACA"), 42 U.S.C.A. § 300gg-19a. Specifically, Plaintiffs maintain that the statute mandates coverage for emergency services, which encompass the services Plaintiff provided in this case.[10] However, as Judge Arterton noted in *Murphy Medical Associates, LLC v. United Medical Resources, Inc.*. No. 3:22CV83(JBA), 2023 WL 2687466 (D. Conn. Mar. 29, 2023), "[a] number of federal courts have held that this provision of the ACA does not provide a private cause of action." 2023 WL 2687466, at *4 (collecting cases).

As in that case, the Plaintiffs here have failed to distinguish the present case from any of those cited by Judge Arterton. Rather, the Murphy Practice has simply argued that it was entitled to deem the COVID tests necessary, stating:

> [A]s the operator of COVID-19 drive-through testing sites, the Murphy Practice was entitled to assume that there was a diagnostic reason for each test and insurance plans and issuers must generally assume that the receipt of the test reflects an individualized clinical assessment.

Doc. 20, at 39. Furthermore, Plaintiffs maintain, the "testing services at issue in this lawsuit meet the definition of emergency services," *id*. at 40, so in conjunction with the Coronavirus Legislation, Plaintiff must have a private right of action under the ACA. In particular, in the Complaint, Plaintiffs allege that "[t]he COVID-19-related testing services provided by the Murphy Practice that are at issue in this lawsuit meet the definition of emergency services under 42 U.S.C. § 300gg-19a"

---

[10] Section 2719A requires that "[i]f a group health plan, or a health insurance issuer offering group or individual health insurance issuer, provides or covers any benefits with respect to services in an emergency department of a hospital, the plan or issuer shall cover [those] emergency services . . . " 42 U.S.C.A. § 300gg-19a (b)(1).

and 29 U.S.C. §1185d(a). Doc. 1, ¶¶ 90-91.

However, § 2719A defines "emergency services" as medical screening services and ancillary services required under 42 U.S.C. § 1395dd  that are "within the capability of the emergency department of a hospital," provided with respect to an "emergency medical condition." 42 U.S.C. § 300gg-19a(b)(2)(B).  An "emergency medical condition" is defined as "a medical condition *manifesting itself by acute symptoms* of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in" serious jeopardy or serious impairment. *Id.* § 300gg-19a(b)(2)(A) (emphasis added).

Section 2719A  defines emergency services in reference to 42 U.S.C. § 1395dd, for the "stated reason in 42 U.S.C. § 1395dd(a)," which "requir[es] a participating hospital [with an emergency department] to provide an 'appropriate medical screening examination' of one suffering from injuries who presents himself at a hospital . . . to determine whether an 'emergency medical condition exists.'"[11] *Collins v. DePaul Hosp.*, 963 F.2d 303, 306-07 (10th Cir. 1992) (quoting 42 U.S.C. § 1395dd(a)).  *See also Macamaux v. Day Kimball Hosp.*, No. 3:09-CV-164 (JCH), 2011 WL

---

[11] Section 1395dd(a), captioned "Medical screening requirement,"  states:

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

42 U.S.C.A. § 1395dd (a).

4352007, at *3 (D. Conn. Sept. 16, 2011) (noting that hospitals are required to "provide uniform or even-handed screening examinations for emergency conditions, consistent with . . . the medical circumstances and symptoms presented").  The Murphy Practice's testing sites were not hospital emergency departments so that Plaintiffs are not entitled to coverage for "emergency services" under § 2719A of the ACA.

Furthermore, Plaintiffs have failed to establish that the services at issue that were provided were actually "emergency services."  For example, Exhibits attached to the Complaint illustrate that the Murphy Practice billed for telehealth visits and nutrition counseling. Doc. 1- 2 to 1-4.  In addition, the Murphy Practice has failed to allege that all of the people it tested were suffering from an "emergency medical condition," evidenced by "acute symptoms" which prompted "immediate medical attention." 42 U.S.C. § 1395dd(e)(1)(A).  Those who were tested arrived at a walk-through site, as opposed to  a hospital emergency department. It thus follows that when Plaintiffs asserted that every BioFire test performed was an "emergency service," that statement was overly broad, a threadbare allegation lacking factual support.  In failing to establish that all of the Murphy Practice's services may be characterized as "emergency" services, the Complaint fails to plead a plausible claim under the ACA.

Like Judge Arteron in *United Medical Resources*, 2023 WL 2687466 , at *4, discussed *supra*, this Court holds that Plaintiff has failed to state an adequate basis to conclude that a private right of action exists under § 2719A.  Moreover, even if such an action existed, § 2719A applies only to "emergency services," which are separate and distinct from the broad range of services rendered by the Murphy Practice in this case.  Plaintiff's ACA claim in Count Two fails as a matter of law and will be dismissed with prejudice.

**C.  Count Three:  ERISA Claim for Benefits or Equitable Relief**

In Count Three, Plaintiffs have  alleged ERISA claims for wrongful denial of benefits and catch-all equitable relief.  However, Defendants assert that the Murphy Practice lacks standing to bring an ERISA claim and that, in any event, Plaintiffs have failed to allege sufficient facts to establish a plausible wrongful denial of benefits claim. Doc. 16-1, at 31, 34.

### *1. Standing*

First, with regard to standing, ERISA does not provide civil enforcement rights to healthcare providers such as the Murphy Practice.  Section 502(a)(1)(B) of ERISA authorizes a health plan "participant or beneficiary" to bring a civil enforcement action to recover plan benefits. 29 U.S.C. § 1132(a)(1)(B).[12]  The statute specifically identifies those who are eligible to receive ERISA's civil remedies and only those identified may sue for such relief.  *See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 27 (1983) ("ERISA carefully enumerates the parties entitled to seek relief under § 502 ");  *Simon v. Gen. Elec. Co.*, 263 F.3d 176, 177 (2d Cir. 2001) (*per curiam*) ("Before the district court, [Plaintiff] Simon conceded that he is neither a  participant nor beneficiary of the plan under which his benefit claims arise" and "[a]ccordingly, he cannot bring suit under § 502.").

In general, healthcare providers lack standing to bring an ERISA claim simply because they provided medical services to participants and beneficiaries.  *See Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 258 (2d Cir. 2015) (a non-participant health care provider cannot bring claims

---

[12] The terms "participant" and "beneficiary" are defined by statute. 29 U.S.C. § 1002 (7)-(8). Healthcare providers are not beneficiaries or participants under ERISA. *See Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 257-58 (2d Cir. 2015).

for benefits on its own behalf and this "interpretation is consistent with every circuit that has considered this question") (collecting cases). *See also Montefiore Med. Ctr. v. Teamsters Loc. 272*, 642 F.3d 321, 329 (2d Cir. 2011) ("§ 502(a)(1)(B) provides that a civil action may be brought 'by a participant or beneficiary' of an ERISA plan to enforce certain rights under that plan pursuant to ERISA[;] [g]enerally, § 502(a) is narrowly construed to permit only the enumerated parties to sue directly for relief.") (citations omitted).

The Second Circuit has, however, "carv[ed] out a narrow exception to the ERISA standing requirements" to grant standing "to healthcare providers to whom a beneficiary has assigned his claim in exchange for health care." *Montefiore Med. Ctr.*, 642 F.3d at 329 (quoting *Simon v. Gen. Elec. Co.*, 263 F.3d 176, 178 (2d Cir. 2001)). *See also Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 361 (2d Cir. 2016) ("Like most of our sister circuits, we have allowed physicians to bring claims under § 502(a) based on a valid assignment from a patient.") (citations omitted).

"To proceed in the shoes of a beneficiary, the assignee must show that there is a valid assignment that comports with the terms of the benefits plan." *Pro. Orthopaedic Assocs., PA v. 1199SEIU Nat'l Benefit Fund*, 697 F. App'x 39, 40 (2d Cir. 2017) (citing *Mbody Minimally Invasive Surgery, P.C. v. Empire Healthchoice Hmo, Inc.*, No. 13CV6551 (DLC), 2016 WL 2939164, at *4 (S.D.N.Y. May 19, 2016)). *See also MC1 Healthcare, Inc. v. United Health Grp., Inc.*, No. 3:17-CV-01909 (KAD), 2019 WL 2015949, at *3 (D. Conn. May 7, 2019)[13] ("To assert an ERISA claim, therefore, a provider must establish that it has a valid assignment of the rights asserted in the

---

[13] *On reconsideration in part*, No. 3:17-CV-01909 (KAD), 2019 WL 3202965 (D. Conn. July 16, 2019).

complaint that comports with the terms of the benefit plan(s) at issue.") (citing, *inter alia*, *McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141, 147 (2d Cir. 2017)). Absent a valid assignment of the right to reimbursement, a healthcare provider lacks standing to bring a claim for benefits. *Neurological Surgery, P.C. v. Aetna Health Inc.*, 511 F. Supp. 3d 267, 281 (E.D.N.Y. 2021)(citing *Simon*, 263 F.3d at 177–78).[14]

In the case at bar, seeking to gain the benefit of the assignment exception, the Murphy Practice makes vague, general allegations regarding assignment of the patients' ERISA rights. In paragraph 49 of the Complaint, the Murphy Practice alleges that it "generally receives assignment of benefit forms from patients who receive testing services at the Murphy Practice testing sites." Doc. 1, ¶ 49. Moreover, "[o]ther patients that registered electronically assigned their benefits to the Murphy Practice." *Id.* However, Plaintiffs neither identify the patients who made the assignments nor demonstrate the existence of any particular assignments. There is also no indication of the language or contents of the alleged assignments. "[T]o obtain standing, the patients' assignment of the right to sue for benefits must be exchanged for healthcare benefits." *Am. Psychiatric Ass'n*, 821 F.3d at 361–62. There is no proof that assignment of that right took place.

---

[14] Citing case precedent, the district court in *Neurological Surgery* explained the Plaintiff's lack of standing as follows:

> The ERISA statute is "narrowly construed" to permit only ERISA enumerated parties—"participant[s] or beneficiar[ies]"—to enforce their right to reimbursement. *See Franchise Tax Bd. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 27, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); *Montefiore Med. Ctr.*, 642 F.3d at 328–29 (citing 29 U.S.C. § 1132(a)(1)(B)). Plaintiff, a health care provider, is not an enumerated party. (*See* Compl. ¶¶ 1–3, 9). Without a valid assignment of this right to reimbursement, (*see id.* ¶¶ 9, 23–24, 27, 401–09, 491–503, 2376), Plaintiff has no standing to bring a claim for benefits.

511 F. Supp. 3d at 281 (citation omitted).

Due to the vagueness of the Complaint's allegations, Plaintiffs have failed to plausibly plead ERISA standing in the present case.  As a provider of healthcare services, Plaintiffs must plead sufficient facts for the Court to determine which patients assigned their ERISA rights and what specific rights were assigned.

As one district court summarized in an analogous case:

> When proving standing, a plaintiff must plausibly plead underlying facts demonstrating a valid assignment of benefits. *Prof'l Orthopedic Assocs., PA v. Excellus Blue Cross Blue Shield*, No. 14-6950, 2015 WL 4387981, at *6 (D.N.J. July 15, 2015). To do so, a plaintiff may include in its complaint the particular language of the assignment or "include the assignment of benefit document itself." *Cohen* [*v. Horizon Blue Cross Blue Shield of New Jersey,* No. 15-4525,] 2015 WL 6082299, at *3 [(D.N.J. Oct. 15, 2015)]. But a conclusory statement merely alleging that a provider was assigned plan benefits from its patients does not plausibly demonstrate standing. *Id.* (finding no valid assignment of benefits when the "[c]ourt [was] left with nothing more than conclusory recitations of the legal standard, which is insufficient under *Iqbal* and *Twombly*").

*Progressive Spine & Orthopaedics, LLC v. Empire Blue Cross Blue Shield*, No. CV 16-01649, 2017 WL 751851, at *5 (D.N.J. Feb. 27, 2017).

In *Progressive Spine*, the complaint alleged that "patients 'all signed contracts 'assign[ing] direct payment of any . . . medical insurance benefits' to [P]laintiff.'" 2017 WL 751851, at *5 (quoting Compl. ¶ 9).   The court held that "[t]his conclusory language f[ell] short of the plausible pleading requirement." *Id.*  As in the case at bar, "Plaintiff did not set forth the actual language from the assignments in its complaint nor did it include a copy of the alleged assignments." *Id.*  "As a result, Plaintiff ha[d] not adequately pled derivative standing." *Id.*

Pleading specific facts regarding the assignments is critical to standing because "[n]ot all ERISA assignments convey the same rights," and a patient-assignor may not have assigned all

potential claims to a provider. *Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 258 (2d Cir. 2015). "For example, an assignment may give the assignee the right to bring only a claim for benefits, but not a claim for breach of fiduciary duty." *Id.*

In the case at bar, the Murphy Practice has failed to provide the identities of the patients who allegedly made assignments and the actual language, content, and/or copies of the assignments. For all of these reasons, the Complaint fails to plead derivative ERISA standing.

### 2. *Failure to Allege Denial of Benefits Claim*

Alternatively, Defendants argue that Plaintiffs have failed to allege a plausible denial of an ERISA benefits claim. They point to the language of 29 U.S.C. § 1132(a)(1)(B). "To state a claim for relief under section 1132(a)(1)(B), a plaintiff must show that '(1) the plan is covered by ERISA, (2) plaintiff is a participant or beneficiary of the plan, and (3) plaintiff was wrongfully denied [benefits] owed under the plan.'" *Curtis v. Aetna Life Ins. Co.*, No. 3:19-CV-01579, 2021 WL 1056785, at *9 (D. Conn. Mar. 18, 2021) (citation and some internal quotation marks omitted).[15] In addition, "[a] plaintiff who brings a claim for benefits under ERISA must identify a specific plan term that confers the benefit in question." *Id.* (citation omitted).

In the case at bar, Plaintiffs fail to identify the plans at issue, to allege facts to establish that ERISA governs the plans, to demonstrate that the plans cover the claims benefits sought, and to state why denial was wrongful. *See, e.g., N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 135 (2d Cir. 2015) (affirming district court's dismissal of ERISA claims where plaintiff failed to allege facts regarding "patients' plans or the terms of their plans"); *MC1 Healthcare, Inc.*, 2019 WL 2015949, at *6 (dismissing ERISA claim where "[plaintiff]  fail[ed] to identify with

---

[15] *Amended*, No. 3:19-CV-01579, 2022 WL 788490 (D. Conn. Mar. 15, 2022).

sufficient particularity the assignor-beneficiaries whose claims it is asserting, the participants through whom the beneficiaries have benefits, or the identity of the plans under which such benefits are allegedly conferred.").[16]

Here, Plaintiffs simply allege that they are "assignees and authorized representatives of [their] patients' claims" so are "entitled to receive protection under ERISA."  Doc. 1, ¶ 120.  Moreover, "Defendants' actions and inactions relating to the claims at issue in this lawsuit are tantamount functionally to a denial of these claims."  *Id.* ¶ 121.  Plaintiffs point to various alleged failures by Defendants in issuing denial of the claims, including, for example, Defendants' failure to specify the reasons for denial, the specific plan provisions relied upon, and the rules relied upon in making their denial.  *Id.* ¶ 124.  However, without specifying the terms of the controlling plans, Plaintiffs have alleged no plausible ERISA claim.  Under these circumstances, the ERISA claim, as pled, must be dismissed.

### 3.  Failure to Exhaust Administrative Remedies

As a final basis for the Court to dismiss Plaintiffs' ERISA claim, Defendants argue that Plaintiffs have failed to adequately plead exhaustion of administrative remedies.  Doc. 16-1, at 35-38.  In order to assert an ERISA claim, a plaintiff must exhaust administrative remedies before filing suit.  *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 105 (2013) ("[P]articipants [are required to] exhaust internal review before bringing a claim for judicial review under § 502(a)(1)(B)"

---

[16] Plaintiffs have failed to even establish that Defendants' conduct is governed by ERISA because not all health insurance plans are governed by ERISA. ERISA only governs "employee benefit plan[s]." *See* 29 U.S.C § 1003(a); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) ("Congress enacted ERISA to 'protect ... the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans . . . .").

so "[a] participant's cause of action under ERISA accordingly does not accrue until the plan issues a final denial.") (citations omitted); *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006)("[T]he federal courts—including this Circuit—have recognized a firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases.") (citation and internal quotation marks omitted); *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir.1993) ("This Court has recognized 'the firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases.'") (quoting *Alfarone v. Bernie Wolff Const. Corp.*, 788 F.2d 76, 79 (2d Cir. 1986)), *cert. denied*, 479 U.S. 915 (1986).

In addition, completion of an *administrative appeal* is necessary to exhaust administrative remedies.  Under 29 U.S.C. §1133, a plan must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2).  "[E]xhaustion in the context of ERISA requires those administrative appeals provided for in the relevant plan or policy." *Kennedy*, 989 F.2d at 594.  As articulated by the Second Circuit, the exhaustion requirement "was intended to 'help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned.'" *Id.* (quoting *Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir. 1980)).

In the instant case, Plaintiffs allege that in response to Defendants' denials and underpayment of claims, the Murphy Practice "sent numerous correspondence to Emblem, GHI and ConnectiCare requesting an explanation for their behavior." Doc. 1, ¶ 63.  Moreover, Plaintiffs state that the "Murphy Practice has attempted to appeal every claim which  Defendants have denied and, through

27

that appeal process, sent Defendants hundreds of pages of responsive medical and laboratory records." *Id.* ¶ 65. All of Plaintiffs' alleged "efforts have largely fallen on [Defendants'] deaf ears" as Defendants "have summarily denied each attempted appeal."[17] *Id.* ¶¶ 66-67.

However, as Defendants maintain, such "general and conclusory allegations are insufficient to plead exhaustion of administrative remedies with respect to the thousands of claims for which Murphy seeks benefits," Doc. 16-1, at 37. *See, e.g.*, *Neurological Surgery, P.C. v. Aetna Health Inc.*, 511 F. Supp. 3d 267, 294 (E.D.N.Y. 2021) ("It is well established that ERISA complaints containing bald assertions that administrative remedies have been exhausted do not withstand a 12(b)(6) motion.") (quoting *Kesselman v. The Rawlings Co., LLC*, 668 F. Supp. 2d 604, 609 (S.D.N.Y. 2009) (citing cases)). Where the allegations regarding appeals are "devoid of context and content," there is nothing to "suggest[ ] that Plaintiff appealed pursuant to the procedure set out in each ERISA plan." *Neurological Surgery*, 511 F. Supp. 3d at 294. Under such circumstances, "[t]he Complaint lacks a basis to reasonably infer what each ERISA plan's appeals procedure required, whether Plaintiff[s] followed that procedure, when the appeal was taken, and when the appeal was decided." *Id.*

Furthermore, pointing to "correspondence and numerous telephone conversations with the insurer, including [plaintiff's] submission of numerous additional documents," is not persuasive to establish that exhaustion has occurred. *Id.* (citing *Antell v. United Healthcare Ins. Co. of N.Y.*, No. 10 Civ. 3194 (RJS), 2012 WL 13042822, at *2 (S.D.N.Y. Mar. 16, 2012) (internal quotation marks

---

[17] In the Complaint, the Murphy Practice states that "Emblem, through counsel, has since advised the Murphy Practice that the Murphy Practice has exhausted its right of appeal on any of the denied claims." Doc. 1, ¶ 69. In contrast, Defendants assert that "plaintiff[s'] general allegations that [they] appealed all the claims at issue but the appeals have 'fallen on deaf ears,' . . . were inadequate to satisfy the pleading requirement." Doc. 16-1, at 37.

omitted). As noted by Judge Sullivan in *Antell*, "'[t]he law . . .*is clear* that correspondence such as that between [plaintiff] and [her insurer] is insufficient to meet the clearly delineated process set forth within' the ERISA plan." *Neurological Surgery*, 511 F. Supp. 3d at 295 (emphasis in original) (quoting *Antell*, 2012 WL 13042822, at *2) .

Here, where Plaintiffs assert that they sent Defendants "numerous correspondence" and "responsive medical and laboratory records"—efforts which allegedly fell "on deaf ears"— Plaintiffs fail to demonstrate that they properly effectuated exhaustion.  Doc. 1, ¶¶ 63-66.  As explained in *Neurological Surgery*, Plaintiffs must allege  "fundamental details," for example, clearly pleading "the key dates ([of their]  claim, the insurer's denial, [their] appeal, *etc.*) as well as the appeals procedure followed."  511 F. Supp. 3d at 295 (citing *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 105-06 (2d Cir. 2005)).[18]

**D.  Count Four:  ERISA Claim for Equitable Relief**

In Count Four of the Complaint, the Murphy Practice seeks equitable relief under ERISA as a matter of law, alleging that Defendants have  "fail[ed] to comply with the substantive and procedur[al] requirements of  ERISA."  Doc. 1, ¶¶ 126-27.  Plaintiffs request "declaratory and injunctive relief" to force Defendants to "comply with the applicable claim procedure regulations."

---

[18]  The Court notes that the Murphy Practice's allegations that Defendants "failed to comply with the substantive and procedur[al] requirements of  ERISA," rendering "any administrative remedies. . . exhausted" and/or "futile to pursue," are also inadequate. Doc. 1, ¶¶ 126-27.   In *Neurological Surgery*, the  plaintiff  similarly  alleged that "all available administrative remedies . . . [were] either . . . denied or have been outstanding for such a long time" that they have been "ignored and are deemed denied." 511 F. Supp. 3d at 294.   The court held that these  "mere conclusory statements" were "without any plausible factual allegations in support."  *Id.*  "[F]utility allegations" are "insufficient" for pleading appeals exhaustion of an ERISA claim.  *Id.* at 296-97 (citation omitted).   In short, such allegations  lack "fundamental details" regarding exhaustion of administrative remedies.  *Id.* at 294.

*Id.* ¶ 129.

Defendants state that this Count "should be dismissed with prejudice" for "numerous reasons." Doc. 16-1, at 38.  First, Defendants state that Plaintiffs' allegation that the Murphy Practice "'generally receives assignment of *benefits* forms,' [Doc. 1] ¶ 49, fails to speak to assignments of plan members' rights to assert equitable claims under 29 U.S.C. § 1132(a)(3)." Doc. 16-1, at 38 (emphasis in original) (collecting cases).  "For example, an assignment may give the assignee the right to bring only a claim for benefits, but not a claim for breach of fiduciary duty." *Id.* at 38-39 (quoting *Rojas*, 793 F.3 at 258).

Second, Plaintiffs' fourth claim for equitable relief under ERISA is duplicative of their third claim.  *Id.* at 39.  "The [United States] Supreme Court has held that 'where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.' " *Biomed Pharms., Inc. v. Oxford Health Plans (N.Y.), Inc.*, 775 F. Supp. 2d 730, 737 (S.D.N.Y. 2011) (quoting *Varity Corp. v. Howe,* 516 U.S. 489, 515 (1996)).

In a factually similar case, also brought by Plaintiffs in this District, Judge Arterton cited the United States Supreme Court's decision in *Varity Corp. v. Howe,* 516 U.S. 489, 515 (1996),  in dismissing Plaintiffs' equitable ERISA claims as duplicative because these "claims [were] adequately addressed under ERISA § 502(a)(1)(B);" and where "Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief." *Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.,* No. 3:20-CV-1675(JBA), 2022 WL

743088, at *10 (D. Conn. Mar. 11, 2022)[19] (quoting *Varity Corp.*, 516 U.S. at 515).

It thus followed that where the plaintiff sought equitable relief that "'f[ell] comfortably within the scope of § 502(a)(1)(B),'" requesting to "recover benefits due to him under the terms of his plan . . . then there [was] no need to 'allow equitable relief under § 502(a)(3).'" 2022 WL 743088, at *10 (quoting *Frommert v. Conkright*, 433 F.3d 254, 270 (2d Cir. 2006)). *See also Frommert*, 433 F.3d at 270 ("While the plaintiffs seek to expand the nature of their claim by couching it in equitable terms to allow relief under § 502(a)(3), the gravamen of this action remains a claim for monetary compensation and that, above all else, dictates the relief available."); *Biomed Pharms., Inc. v. Oxford Health Plans (N.Y.), Inc.*, 775 F. Supp. 2d 730, 738 (S.D.N.Y. 2011) ("[T]he Court finds that Biomed's three ERISA § 502(a)(3) claims are in fact entirely duplicative of its claim for benefits under ERISA § 502(a)(1)(B), as the gravamen of all three Counts is that [the insurer] improperly denied the Patient benefits to which he was entitled under the Plan.") (citing *Frommert*, 433 F.3d at 270 (2d Cir. 2006)).

Based on Plaintiff's vague allegations regarding the alleged assignment of ERISA rights and in light of the fact that Plaintiff's equitable ERISA claims are duplicative as adequately addressed under ERISA § 502(a)(1)(B), Plaintiffs's fourth claim will be dismissed.

## E.  Counts Five through Eight:  State Law Claims - Supplemental Jurisdiction

Defendants seek dismissal of all of Plaintiffs' state law claims as preempted by ERISA. However, because the Court will dismiss all federal claims in this action – those arising under the FFCRA, the CARES Act, and ERISA– *i.e.*, all claims supporting the Court's original subject matter

---

[19] *On reconsideration,* No. 3:20-CV-1675(JBA), 2022 WL 10560321 (D. Conn. Oct. 18, 2022).

jurisdiction under 28 U.S.C. § 1331, the issue arises as to whether the Court should exercise supplemental jurisdiction over the remaining state law claims.[20]  Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C.A. § 1367(a).  However, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if– . . . (3) the district court has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3).  *See, e.g., Smith v. Da Ros*, 777 F. Supp. 2d 340, 366 (D. Conn. 2011) (dismissing federal claim and declining to exercise supplemental jurisdiction over remaining state law claim).

A district court is entitled to decline supplemental jurisdiction when the claim "raises a novel or complex issue of State law,"  the state law claim "substantially predominates over the claim or claims over which the district court has jurisdiction,"  when the district court "has dismissed all claims within its original jurisdiction," or for "other compelling reasons." 28 U.S.C. § 1367(c)(1)-

---

[20]  Pursuant to 28 U.S.C. § 1331, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

   In the present case, the facts pled provide no basis for alternative federal subject matter jurisdiction pursuant to diversity of citizenship.  *See* 28 U.S.C. § 1332(a) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between– (1) citizens of different States . . . .").  Plaintiffs have failed to plead sufficient facts to establish the citizenship of the parties and have instead claimed that the "Court has jurisdiction over this dispute under 28 U.S.C. § 1331 because the Murphy Practice asserts federal claims against Defendants under the Families First Coronavirus Relief Act, the CARES Act, the Affordable Care Act, and ERISA." Doc. 1, ¶ 18 (captioned "Jurisdiction and Venue").

(4). It is well-established that supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  As the United States Supreme Court explained:

> Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

383 U.S. at 726. Accordingly, courts have the authority to determine when supplemental jurisdiction is appropriate.

In circumstances where a federal court has dismissed all federal claims in which original jurisdiction existed, it is incumbent on the court to "reassess its jurisdiction over the case by considering several factors—judicial economy, convenience, fairness, and comity." *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d. Cir. 2004) (citing *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1191 (2d. Cir. 1996)). In particular, in the Second Circuit, courts have consistently held that "if [all] federal claims are dismissed *before trial* ... the state claims should be dismissed as well.'" 388 F.3d  at 56 (emphasis in original; citations and internal quotation marks omitted).

In the case at bar, the state law claims present novel issues in that no Connecticut court has directly addressed whether Defendants' alleged conduct has violated the Connecticut common and statutory law, as argued by the Murphy Practice.  Comity militates toward refraining from attempting to determine how Connecticut's highest court might rule on such issues.[21]

---

[21] At this time, the Court does not address  Defendants' argument that the state law claims are preempted by ERISA.  Nor does the Court analyze alternative theories Defendants have presented

Furthermore, the case remains in its earliest stages of litigation and clearly before trial. Under these circumstances, the Court declines to exercise supplemental jurisdiction over the state law claims.

## VI. CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss [Doc. 16] is GRANTED in its entirety. Plaintiffs' Counts One and Two, those arising under the FFCRA, the CARES Act, and the ACA, are dismissed with prejudice. The ERISA claim in Count Three is dismissed without prejudice, but the ERISA claim in Count Four is dismissed with prejudice as duplicative of the one asserted in Count Three. In light of the present dismissal of all federal claims, Plaintiffs' state law claims in Counts Five to Eight are dismissed because the Court declines to exercise supplemental jurisdiction over them.

As to leave to amend, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir. 1991). *See also Kopchik v. Town of E. Fishkill, New York*, 759 F. App'x 31, 38 (2d Cir. 2018) ("It is inappropriate to deny a plaintiff the opportunity to replead after a defendant's motion to dismiss is granted, simply because the plaintiff decided not to replead before learning whether the court would find the complaint insufficient."). The Court thus affords Plaintiffs the opportunity to replead the ERISA claim in Count Three, which is dismissed without prejudice, in an effort to rectify, if possible, the

---

for dismissal of Plaintiffs' state law claims (*i.e.*, inadequate pleading of the facts to constitute unjust enrichment, failure to plead the existence of implied contracts with the beneficiaries, no private right of action under CUIPA, and no plausible claim under CUTPA). Although one or more of these theories may very well possess merit, the Court exercises "judicial restraint" to refrain from discussing theories regarding claims over which it has determined it will not exercise supplemental jurisdiction. "[W]hen a court can resolve a case based on a particular issue, it should do so without reaching unnecessary issues." *Black's Law Dictionary* (12th ed. 2024).

defects specified in this Ruling. Plaintiffs are advised that absent a viable federal claim, the Court may not exercise federal question jurisdiction, 28 U.S.C. §1331.  Any amended complaint must be filed on or before **November 18, 2024**, or the case will be promptly closed.

It is SO ORDERED.

Dated: New Haven, Connecticut
        October 3, 2024

_/s/Charles S. Haight, Jr._
CHARLES S. HAIGHT, JR.
Senior United States District Judge